IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| SUSAN L. ROWE, CHRISTINE M. KLEIBER, TAMMY D. BURDEN, JULIE A. SCHROPP, STACEY L. GOOD, individually and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>KIMBERLY KAY REYNOLDS, in her official capacity as Governor of the State of Iowa, JAMES M. KURTENBACH, in his official capacity with Iowa Department of Administrative Services, and the STATE OF IOWA,<br>　　　　　　Defendants. | No. 4:19-cv-00256-SHL-SBJ<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

Federal regulations state that Registered Nurses "generally" are exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") if they are paid on a salaried basis. In this collective action, Plaintiffs argue the general rule does not apply to them despite their status as Registered Nurses because: (a) their "primary duties" are lower-level duties performed by non-exempt Licensed Practical Nurses; and (b) they are paid hourly, not by salary. The Court rejects as a matter of law Plaintiffs' "primary duties" argument and therefore GRANTS IN PART Defendants' Motion for Summary Judgment. The Court cannot conclude as a matter of law, however, whether Plaintiffs are paid hourly or by salary for purposes of the FLSA and therefore DENIES IN PART Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment.

I.　　**FACTUAL AND PROCEDURAL BACKGROUND[1]**

　　*A.　Parties.*

　　This is a collective action under the FLSA. (ECF 94-1, ¶ 3.) Named Plaintiffs are Registered Nurses ("RNs") who are employed by the State of Iowa and work at Woodward

---

[1] The facts are largely undisputed, although the parties often disagree about the legal significance of those facts. In the event of a true dispute regarding material facts, the Court views the matter in the light most favorable to the non-moving party. *See Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680 (8th Cir. 2012).

Resource Center, the Iowa Medical and Classification Center, and the Iowa State Penitentiary. (Id., ¶¶ 4, 5.) At times, some of them performed work at other State facilities. (Id., ¶ 5.) In total, there are 209 opt-in plaintiffs, including 137 current and 72 former RNs who are (or were) employed at 14 state-run facilities, including the Iowa Veterans Home and institutions in the Department of Corrections and Department of Human Services. (ECF 93-2, ¶¶ 5, 7.) Defendants include the State of Iowa, Governor Kim Reynolds, and James Kurtenbach, the Director of the Iowa Department of Administrative Services. (Id., ¶¶ 13, 14.) Governor Reynolds and Director Kurtenbach were sued in their official capacities. (Id.)

   B. *Details Regarding Plaintiffs' Employment.*

   RNs like Plaintiffs who work for the State do so under the job description of "Registered Nurse," in contrast to Licensed Practical Nurses ("LPNs") who work under the job description of "Licensed Practical Nurse." (Id., ¶ 35.) The Iowa Board of Nursing regulates RN and LPN licensures for the State and has adopted rules providing the scope of duties for both RNs and LPNs. (Id., ¶¶ 36, 37.) To apply for an RN license, a person must complete at least a two-academic-year course of study or its equivalent in theory and practice. (Id., ¶ 39.) By contrast, an LPN license requires only a one-academic-year course of study or its equivalent in theory and practice. (Id., ¶ 40.) RNs are required to wear identification clearly identifying them as registered nurses when providing direct patient care unless wearing such identification would create a health or safety risk for the nurse or patient. (Id., ¶ 42.) LPNs are required to wear identification clearly identifying them as licensed practical nurses. (Id., ¶ 43.)

   RNs have a wider scope of practice than LPNs, although Plaintiffs assert that the extent to which it is wider depends on the setting or practice. (Id., ¶ 44.) RNs perform certain duties that LPNs cannot perform because of their education, training, and experience, such as initial assessments of patients with restraints, forced injections, and work on peripherally inserted central catheter lines and port access. (Id., ¶¶ 45–49.) An RN must be on staff on every shift at State facilities, whereas there is no minimum staffing requirement for LPNs. (Id., ¶ 50.) LPNs must work under the general supervision of an RN or physician and may not independently perform certain tasks such as initial assessments or the initial administration of medicine by Bolus or IV. (Id., ¶¶ 51, 52.) Absent additional training beyond the minimum requirements for LPN licensure, LPNs are not permitted under Iowa law to perform activities requiring the knowledge and

education of an RN. (Id., ¶¶ 54–57.) An RN's licensure is at risk of sanction even when the RN is performing work that also could be performed by an LPN. (Id., ¶ 59.)

The summary judgment record includes lengthy descriptions from each Named Plaintiff regarding the day-to-day work of RNs at State facilities. (ECF 94-1, ¶¶ 46–50.) Plaintiff Susan Rowe, for example, says a "substantial part" of her work is on "routine and physical tasks." (Id., ¶ 46.) She estimates that she spends more than 50% of her time, and perhaps as much as 95%, performing duties and tasks that could be performed by an LPN or other staff member. (Id.) Rowe says RNs and LPNs are used interchangeably at State-run facilities "to perform the same types of tasks, duties and functions, with an RN only called in as needed for the few tasks that may [] need[] to be done with an RN helping." (Id.) She acknowledges that a "small portion" of her time—perhaps as little as 5%—is spent performing work that only an RN can perform, such as "initial assessments" and "acute care, restraint management, triage and suicide assessment." (Id.) According to Rowe, this work is "not predominantly intellectual in character" and does not require "the consistent exercise of discretion and judgment." (Id.)

There are times when Rowe is required to do a visual assessment on an individual who might need a restraint, but she says she is "only a part of that decision and in fact they generally would only need me to be involved in that decision because the[y] need a[n] RN to obtain the order for a restraint from the physician…" (Id.) She says other non-RN staff "work alongside [] me to do those checks. All of us use our mental, manual and physical abilities to do those checks." (Id.) Similarly, she acknowledges that RNs must make initial assessments but says "thereafter LPN staff make the same type of measurements, assessments, notations and use of discretion in carrying out the care of the individual." (Id.) Likewise, when making rounds or assessing a person's need for a medical procedure, Rowe says RNs and LPNs alike "complete an assessment, initiate standing orders or contact the physician for orders, complete follow up assessments and make complete aspects of ensuring the individual is treated and the illness resolves in a timely fashion." (Id.) She acknowledges "us[ing] mental processes to evaluate that concept" but says LPNs do, too. (Id.) Rowe says RNs and LPNs alike have the "ability to contact the physician staff, present the individual's findings, make recommendations, and obtain medical authorization, or not, for performing medical tests or proceeding medically as to the individual." (Id.) "Then the testing or treatment can be processed, with only a few of the tasks needing an RN to be involved in

performing along with the LPN or other staff." (Id.) Other Named Plaintiffs describe their work similarly. (Id., ¶¶ 47–50.)

The State generally compensates RNs more highly than LPNs. (ECF 93-2, ¶ 60.) As of July 1, 2017, the pay range for RNs employed by the State was roughly ten to twenty percent higher than the pay range for LPNs employed by the State. (Id., ¶¶ 70–73.) An experienced LPN may, however, be compensated more highly than a new RN based on overlap in the pay scale. (Id.) As of July 1, 2017, Named Plaintiffs earned between $35 and $41 per hour (although the State characterizes them for FLSA purposes as "salaried" employees). (Id., ¶¶ 62–66.) At least two Named Plaintiffs earned in excess of $70,000 in 2019. (Id., ¶¶ 67, 69.) A third, Plaintiff Susan Rowe, said she earns almost $4,000 per two weeks when she works an 80-hour schedule. (Id., ¶ 68.)

The State classifies RNs as "exempt" under the FLSA but classifies LPNs as "non-exempt." (ECF 94-1, ¶¶ 38, 40.) Notwithstanding, RNs and LPNs perform some of the same duties. (Id., ¶ 16.) Supervisors assign, schedule, and supervise LPNs and RNs, and LPNs can pick up RN shifts anytime. (Id., ¶ 41.) The State tries, however, not to put LPNs into positions where they have to perform RN tasks. (Id.)

RNs are scheduled for specific, pre-determined shifts a week ahead of time and must complete paperwork, find coverage, and ask permission if they need to change their schedules. (Id., ¶ 30.) RNs punch in and out on a time clock. (Id., ¶ 31.) RNs can volunteer for overtime hours, but if there are not enough volunteers, the State can force them to work. (Id., ¶ 25.) This is not something supervisors ever do. (Id.) The "Overtime list" does not identify RN or LPN needs separately. (Id., ¶ 26.) RNs are required to cover for supervisors on weekends and holidays. (Id., ¶ 28.) Unlike RNs and LPNs, supervisors ordinarily do not work weekends and holidays. (Id.)

The State employs a leave policy whereby RNs and other state employees are required to track their hours if they take leave. (ECF 93-2, ¶ 75.) If State employees take leave, or are out of leave time, and have not worked the minimum required number of hours, the State has the ability to deduct employees' wages based on the numbers of hours they did not work. (Id., ¶¶ 76, 77.)

The State pays Plaintiffs on a bi-weekly basis at an hourly rate based on how many hours they have worked. (Id., ¶ 78.) The State contends—but Plaintiffs dispute—that this is done "in accordance with Section 541.710 of the Code of Federal Regulations." (Id.; ECF 94-1, ¶ 19.) Plaintiffs are always scheduled to work at least 40 hours in a week, or at least 80 hours every two

weeks, unless taking sick or vacation time. (ECF 93-2, ¶ 79.) In the past, RNs working for the State occasionally have been furloughed, including a full week without pay. (ECF 94-1., ¶ 24.)

C. *Collective Bargaining Agreements and Overtime Pay.*

Plaintiffs' employment is governed by collective bargaining agreements between the State and the American Federation of State, County and Municipal Employees. (ECF 93-2, ¶ 1.) Prior to July 1, 2017, the agreement entitled Plaintiffs to premium overtime pay for hours worked in excess of 80 hours per two-week period. (ECF 94-1, ¶¶ 10, 19.) Starting July 1, 2017, however, the collective bargaining agreement changed, and Plaintiffs no longer had a contractual right to overtime pay. (Id., ¶ 14.) This change occurred on the effective date of a new law limiting the collective bargaining rights of State employees. *See generally* Public Employment Relations Act, Iowa Code §§ 20.1 *et seq.*

Although the new collective bargaining agreement did not require the State to pay overtime hours, the Iowa Department of Administrative Services instituted rule waivers in July 2017 permitting Plaintiffs and other RNs to receive hour-for-hour overtime pay anyway. (ECF 94-1, ¶ 14.) The State did not, however, pay a premium overtime rate to RNs, although it did pay premium overtime rates to LPNs. (Id., ¶ 16; ECF 93-2, ¶ 27.) Later, in the midst of the Covid-19 pandemic, the State started paying premium overtime rates to RNs and LPNs alike. (ECF 93-2, ¶ 29.) As of mid-2022, RNs continue to receive premium overtime. (Id., ¶ 30.)

Other facts will be discussed where relevant below.

## II. LEGAL BACKGROUND AND STANDARDS

A. *Legal Standard on Motions for Summary Judgment.*

"Summary judgment is appropriate where the evidence, viewed in the light most favorable to the nonmovant, shows that no genuine issue of material fact exists, such that the movant is entitled to judgment as a matter of law." *Tusing v Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 514 (8th Cir. 2011) (citing *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078 (8th Cir.2008)). "There is no genuine issue of material fact when 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Grage v. N. States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011)). The burden of proving the absence of any genuine issue of material fact rests on the movant. *Id.* Nonetheless, "a nonmovant may not rest upon mere denials

or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Tusing*, 639 F.3d at 514 (quoting *Wingate*, 528 F.3d at 1078–79).

### B. Background Regarding the Fair Labor Standards Act.

"The purpose of the FLSA 'is to protect the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir. 2011) (quoting *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999)). "It does so in part by setting forth substantive wage, hour, and overtime standards." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011). This includes, as relevant here, a provision establishing that "no employer shall . . . [have a] workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Plaintiffs argue the State violated this overtime requirement by failing to pay overtime at a premium rate beginning July 1, 2017. Defendants, in turn, argue that Plaintiffs are exempt from the FLSA.

A plaintiff seeking relief under the FLSA bears the initial burden of proving an employer-employee relationship and that the activities for which recovery is sought "constitute employment for purposes of the Act." *Specht*, 639 F.3d at 819 (quoting *Benshoff*, 180 F.3d at 140). If this burden is satisfied, the burden shifts to the employer to prove an exemption or exception to the FLSA's compensation requirements. *See id.* at 819–20. "When an employer contends it is exempt from the Act, the employer has the burden of establishing the exemption clearly and affirmatively." *Id.* at 820 (quoting *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993)) (cleaned up).

"Courts should broadly interpret and apply the FLSA to effectuate its goals because it is 'remedial and humanitarian in purpose.'" *Id.* at 819 (quoting *Benshoff*, 180 F.3d at 140). However, the Court should not interpret FLSA exemptions narrowly. *Encino Motorcars, LLC v. Navarro*, --- U.S. ----, 138 S. Ct. 1134, 1142 (2018). "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a 'narrow') interpretation." *Id.* (cleaned up).

Defendants do not dispute the existence of an employer-employee relationship or that Plaintiffs' activities constitute "employment" for purposes of the FLSA. Thus, Defendants bear the burden of proving an exemption. *See Grage*, 813 F.3d at 1054. The specific exemption upon which they rely is set forth in 29 U.S.C. § 213(a), which states that overtime requirements "shall

not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by [Department of Labor] regulations." *Id.* Defendants argue that Plaintiffs are "learned professionals" pursuant to § 213(a) and corresponding federal regulations found at 29 C.F.R. §§ 541.300 *et seq.*

To establish the learned professional exemption, Defendants must satisfy two layers of requirements. First, they must prove the elements applicable to any employee for whom an exemption is claimed pursuant to 29 U.S.C. § 213(a): "[1] the employee's 'primary duty' is the performance of exempt work, 29 C.F.R. § 541.700; [2] that he is paid not less than the minimum salary level, § 541.600; and [3] that he is paid on a 'salary basis,' § 541.602." *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 (8th Cir. 2020).[2] Second, and specific to the "primary duty" issue as applied to learned professionals, Defendants must prove that Plaintiffs' primary duty is "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized instruction." 29 C.F.R. § 541.301(a).

## III.    LEGAL ANALYSIS

### A.  Defendants Have Met Their Burden of Proof as a Matter of Law on the "Primary Duties" Requirement.

The Department of Labor has enacted regulations specifically addressing the exempt or non-exempt status of RNs and LPNs under the learned professional exemption:

> Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

29 C.F.R. § 541.301(e)(2). Neither party has suggested this regulation is arbitrary, capricious, or manifestly contrary to the statute, and thus the Court must give it deference. *See Fast v. Applebee's Intern., Inc.* 638 F.3d 872, 876 (8th Cir. 2011).

Most courts have honored the language of § 541.301(e)(2) by holding that RNs indeed satisfy the primary duties requirement for the learned professional exemption. *See, e.g.*, *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 138 (2d Cir. 2020); *Williams v. Genex Servs., LLC*, 809 F.3d 103, 110–11 (4th Cir. 2015); *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 864 (C.D.

---

[2] It is undisputed that Plaintiffs earned enough at all relevant times to satisfy the minimum salary requirement, and thus this opinion will focus solely on the primary duty and salary basis requirements.

Cal. 2012). The issue is seen as so straightforward that plaintiffs sometimes concede the point or courts give it only perfunctory attention. *See, e.g.*, *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 676 (6th Cir. 2000) ("[T]he plaintiffs concede that their work as registered nurses making home health care visits required knowledge of an advanced type and the consistent exercise of discretion and judgment and that it was predominantly intellectual and varied in character."); *Hicks v. Great Lakes Home Health Servs., Inc.*, No. 17-CV-12674, 2018 WL 2363959, at *5 (E.D. Mich. May 24, 2018) ("There is no dispute that [plaintiff] satisfies the duties prong because she is a registered nurse."); *Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 187 (E.D.N.Y. 2004) ("Here, plaintiffs were all registered nurses and therefore satisfy the duties test for the professional exemption.").

Plaintiffs barely mention § 541.301(e)(2) in their briefs—much less the caselaw applying it as written—although they implicitly acknowledge it by emphasizing the overlap between their work and work performed by LPNs in State facilities. In essence, Plaintiffs' position is that their "primary duties" are the same as those performed by LPNs and therefore, they should be treated like LPNs for purposes of the FLSA. Or, stated differently, they argue that this case is the exception that proves why § 541.301(e)(2) says RNs "generally" qualify for the learned professional exemption instead of "always." Careful review of the record shows why Plaintiffs' position is wrong as a matter of law.

The undisputed facts show that Plaintiffs, as RNs, have more education than LPNs (at least two years versus one), receive a separate and more rigorous licensure from the State, get paid ten to twenty percent more than LPNs with similar levels of experience, and perform tasks that LPNs are not allowed to perform. The record further shows that Plaintiffs' positions require RN licensure, RNs can have supervisory responsibilities over LPNs (but not vice versa), and RNs must be staffed on every shift at State facilities, whereas no similar staffing requirement exists for LPNs. These facts are similar to those present in other cases where courts found the primary duties requirement satisfied as a matter of law. *See, e.g.*, *Mudgett v. Univ. of Pittsburg Med. Ctr.*, No. CIV.A.09-254, 2010 WL 1838413, at *7 (W.D. Pa. May 6, 2010) (concluding that RN satisfied the primary duties test where she possessed "more skills" and "more responsibility" than LPNs).

In arguing otherwise, Plaintiffs focus on the relatively high percentage of time (which they estimate as "more than 50%, perhaps as much as 95% at times") they spend performing the same work as LPNs. This argument fails for at least two reasons. <u>First</u>, although the percentage of time

spent performing non-professional tasks can be a "useful guide" in deciding whether the learned professional exemption applies, the primary duties test is not simply a matter of arithmetic. *See* 29 C.F.R. § 541.700(b) ("Time alone . . . is not the sole test, and nothing in [Department of Labor regulations] requires that exempt employees spend more than 50 percent of their time performing exempt work.") Instead, § 541.700 requires a more holistic inquiry:

> (a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.
>
> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

Applying this language, courts have rejected arguments like those made by Plaintiffs regarding the amount of time spent on exempt versus non-exempt work. *See, e.g.*, *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 43 (D.D.C. 2007) ("[S]uch exempt work was plaintiff's primary duty, even if it occupied less than fifty percent of her workday.").

<u>Second</u>, and far more importantly, the Court rejects Plaintiffs' implicit argument that if an RN's work is also performed by an LPN, this means the work must be non-exempt. Take, for example, Plaintiff Rowe's description of her work evaluating patients:

> Also, considering initial assessments. I understand those need to be performed by an RN. But, thereafter LPN staff make the same type of measurements, assessments, notations and use of discretion in carrying out the care of the individual. Take also the task of evaluating or assessing the need of an individual for a medical procedure or making rounds. After the

initial assessment for any acute illness or staff concern an RN or an LPN can complete an assessment, initiate standing orders or contact the physician for orders, complete follow up assessments and make complete aspects of ensuring the individual is treated and the illness resolves in a timely fashion.

I use mental processes to evaluate that concept. Likewise do the LPN staff. The LPN staff have the same ability to contact the physician staff, present the individual's findings, make recommendations, and obtain medical authorization, or not, for performing medical tests or proceeding medically as to the individual. Then the testing or treatment can be processed, with only a few of the tasks needing an RN to be involved in performing along with the LPN or other staff.

(ECF 94-1, ¶ 46.)[3] Parsing the language—and setting aside the comparisons between RNs and LPNs—this description shows that Plaintiff Rowe completes initial assessments, takes measurements, makes notations, uses discretion, initiates standing orders, contacts physicians for orders, completes follow up assessments, presents an individual's findings, makes recommendations, obtains medical authorization (or not) for tests, and otherwise "ensur[es] the individual is treated and the illness resolves in a timely fashion." (Id.) These are important responsibilities that require RNs to call upon their training and experience to make discretionary decisions necessary to assure patient well-being. Duties like these are well in line with what other courts have found sufficient to satisfy the primary duties test in the context of RNs. *See, e.g.*, *Williams*, 809 F.3d at 110–11 (finding primary duties test satisfied where RN reviewed medical records, interviewed injured workers, developed care plans, coordinated medical care, communicated with medical providers, educated injured workers, and made recommendations concerning alternative forms of treatment); *Rieve*, 870 F. Supp. 2d at 864 (finding primary duties testified satisfied where RN "interacted with physicians and patients and provided skilled advice, despite the fact that she did not have the authority to order or alter any course of treatment herself"); *Powell*, 518 F. Supp. 2d at 43 (finding primary duties test satisfied where RN determined whether personnel met medical requirements for deployment and addressed their health issues).

Plaintiffs cite only one case in which a court found an RN to be non-exempt: *Rego v. Liberty Mut. Managed Care, LLC*, 367 F. Supp. 3d 849, 859–62 (E.D. Wis. 2019). The RN in *Rego*, however, was not working in direct patient care in a clinical setting, but rather was performing utilization review for a managed care company to determine whether requested

---

[3] The other named Plaintiffs use nearly identical language to describe their work. (Id., ¶¶ 47-50.)

medical services were medically necessary. *Id.* at 851; *see also Clark v. Centene Co. of Texas, L.P.*, 656 F. App'x 688, 693 (5th Cir. 2016) (concluding that nurses performing file review did not satisfy primary duties test where RN licensure was not prerequisite to the job). The Second Circuit refused to follow *Rego* and criticized it as resting on a "mistaken legal premise" regarding the elements of the learned professional exemption. *Isett*, 947 F.3d at 135. Other cases pre-dating *Rego* likewise appear to disagree with its holding. *See, e.g.*, *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 32–33 (D. Mass. Sept. 30, 2015) (finding primary duties test satisfied in connection with RN who performed utilization review); *Rieve*, 870 F. Supp. 2d at 864 (same). *Cf. McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) (concluding claims adjuster's work required the exercise of discretion and independent judgment).

This Court need not determine whether *Rego* was correctly decided. For present purposes, it is enough to say it is readily distinguishable. Plaintiffs here do not review files. Rather, they care directly for patients in a clinical setting as a principal part of their work in positions that require RN licensure and the performance of duties that only RNs can perform and for which they receive ten to twenty percent more compensation than LPNs with the same years of experience. In these circumstances, based on the plain language of 29 C.F.R. § 541.301(e)(2) and the body of case law applying it as written, the Court must conclude the primary duties test is satisfied as a matter of law. The Court therefore GRANTS IN PART Defendants' motion for summary judgment.

   B.   *The Court Cannot Decide as a Matter of Law Whether Plaintiffs Are Hourly or Salaried Employees.*

Although the "primary duties" requirement of the learned professional exemption has been satisfied, Plaintiffs nonetheless are non-exempt under the FLSA if they are paid hourly, rather than by salary. *See* 29 C.F.R. § 541.300(a) (requiring the employee to be "[c]ompensated on a salary or fee basis"). 29 C.F.R. § 541.602(a) defines "salary basis" as follows:

> An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

The regulation explains that an "exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." *Id.*, § 541.602(a)(1). "An employee is not paid on a salary basis if deductions from the employee's

predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business." *Id.*, § 541.602(a)(2).

There are numerous interpretive rules, many of which give employers flexibility in how they compensate "salaried" employees without losing the exemption. *See generally Coates*, 961 F.3d at 1042–43. For example, "[a]n employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). "Similarly, the exemption is not lost if an exempt employee who is guaranteed at least $684 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek." *Id.* "Such additional compensation may be paid on any basis (e.g., flag sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off." *Id.* Relatedly, "[a]n exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the payment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked." *Id.* § 541.604(b). As the Eighth Circuit explained in *Coates*, these rules have the effect of turning a "common term like 'salary'" into something that is "obviously ambiguous in the context of the statute or regulation at issue." 961 F.3d at 1044.

Defendants rely heavily on an additional rule specific to public employers, often known as the "public accountability" exception. *See* 29 C.F.R. § 541.710. This exception gives public employers greater latitude than private employers to reduce pay when employees fail to work 80 hours over a two-week period:

> An employee of a public agency who otherwise meets the salary basis requirements of § 541.602 shall not be disqualified from exemption under . . . 541.300 . . . on the basis that such employee is paid according to a pay system established by statute, ordinance, or regulation, or by a policy or practice established pursuant to principles of public accountability, under which the employee accrues personal leave and sick leave and which requires the public agency employee's pay to be reduced or such employee to be placed on leave without pay for absences for personal reasons or because of illness or injury of less than one work-day when accrued leave is not used by an employee because:
>
> > (1) Permission for its use has not been sought or has been sought and denied;

12

(2) Accrued leave has been exhausted; or

(3) The employee chooses to use leave without pay.

*Id.*, § 541.710(a). Defendants argue the requirements of § 541.710 are satisfied here.

Plaintiffs, for their part, focus on undisputed facts that they argue establish their status as "hourly" employees. For example, they are scheduled for shifts with specific start and end times, are required to clock-in and clock-out at the beginning and end of those shifts, are paid based on the clock-in and clock-out times (rather than the shift start- and end-times), must use annual or sick leave in order to get paid for a full 80 hours if their actual hours are lower, will have their pay docked if they work fewer than 80 hours and do not have sufficient leave available, and have always (both before and after June 1, 2017) received extra pay calculated on an hourly basis when their hours exceed 80.

These facts are not enough to allow the Court to conclude as a matter of law that Plaintiffs are hourly employees for purposes of the FLSA. In *Coates*, the Eighth Circuit held in the face of similar undisputed facts that the district court erred in granting summary judgment for the plaintiffs. 961 F.3d at 1045–48. The Court explained that Department of Labor interpretive rules expressly allow employers to record and track hours and make deductions from annual or sick leave for absences in certain circumstances. *Id.* at 1045. "If Falcon Jet complied with these fact-intensive interpretive rules, Plaintiffs were exempt employees no matter how much Falcon Jet's method of compensation resembled payroll procedures for the typical hourly wage-earner." *Id.*

*Coates* also, however, prevents the Court from concluding as a matter of law that Plaintiffs are salary basis employees, as Defendants insist. The Eighth Circuit refused to so hold in *Coates* because it found that the "largely undeveloped summary judgment record in this case includes evidence that [some plaintiffs] received arguably improper reductions in pay." *Id.* at 1045–46. Moreover, even if improper deductions had been made, the district court failed to analyze whether "the facts demonstrate that the employer did not [or did] intend to pay employees on a salary basis." *Id.* at 1047 (quoting 29 C.F.R. § 541.603(a)). Similarly, but of even greater importance here, *Coates* directed the district court to determine whether the employees were "guaranteed" the minimum required amount, paid on a salary basis. *Id.* at 1048.

There are several factual differences between this case and *Coates*, but they point in competing directions and therefore reinforce why summary judgment should not be granted for either side. For example, unlike the employees in *Coates*, who received a payroll notification expressly describing their compensation as an "annual salary," *id.* at 1045, Defendants here have

not directed the Court's attention to anything conclusive in the summary judgment record in which the State used the word "salary" (or any variation thereof) in Plaintiffs' employment paperwork to describe their compensation.[4] Plaintiffs' job descriptions, for example, do not describe them as "salaried" employees, nor have Defendants pointed to anything in the record using that term other than their own discovery responses. (E.g., ECF 90-2, ¶¶ 62–66.) The Court tried to scour the parties' appendices on its own, but this made the ambiguity worse, not better. For example, Plaintiff Tammy Burden testified that she "never actually got any documentation stating that we were completely switching to salary" (Defs. Appx. 149), whereas Plaintiff Stacey Good appeared to confirm that her offer letter described her pay as a bi-weekly "salary" of $1,864 (Pl. Appx. 199).[5] The Eighth Circuit attached significance to the words "annual salary" in the payroll notification in *Coates*, and thus the Court must also treat as significant the potential absence of any similar terminology here. *See id.*, 961 F.3d at 1045 (explaining that the FLSA requires "no other contractual 'bells and whistles'" beyond "annual salary at a specific predetermined amount on a bi-weekly basis").

Similarly, the Court cannot find anything in the summary judgment record establishing as a matter of undisputed fact that the State "guaranteed" Plaintiffs the pro-rata portion of their annual salary during each two-week pay period regardless of the number of hours worked. *See* 29 C.F.R. § 541.604(b) ("An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, **if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked**…") (emphasis added). Defendants repeatedly assert that Plaintiffs were "always scheduled to work 80 hours except when annual or leave was requested," but this is noticeably different than alleging that Plaintiffs were "guaranteed" full compensation regardless of the number of hours worked. *See Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 292 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 2674 (2022) ("[The employer] could have easily complied with § 541.604(b)—for example, by offering a minimum weekly guarantee… It has not done so. Under the plain text of § 541.604(b),

---

[4] To be clear, Defendants repeatedly refer to Plaintiffs as "salaried" employees in their briefs and statements of undisputed facts (or responses to Plaintiffs' statements of undisputed facts), but the Court cannot give effect to these labels unless they find sufficient support in the underlying record. *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) ("An issue of material fact is genuine if it has a real basis in the record.").

[5] Neither side included the offer letter itself in its Appendix.

that is all that matters."). In fact, the version of the collective bargaining agreement in effect from 2013 to 2015 expressly disclaimed any such guarantee: "Nothing herein shall be construed as a guarantee of the number of hours of work per day or per work week." (Pl. Appx. 10.) As neither side has directed the Court to pertinent language in the more recent versions of the collective bargaining agreement (or any other document[6]), the Court is unable to determine whether the State schedules Plaintiffs for 80 hours each pay period because it is obligated to do so, or if this is merely a function of the State's current staffing needs. The difference is crucial under the FLSA. *See* 29 C.F.R. § 541.602(a)(2) ("An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business."); *Hewitt*, 15 F.4th at 292 (failure to provide minimum guarantee is outcome-determinative in the employee's favor).

The Court understands, of course, that the public accountability exception gives public employers like the State greater flexibility to make deductions when fewer than 40 hours are worked each week. *See* 29 C.F.R. § 541.710; *see generally Demos v. City of Indianapolis*, 302 F.3d 698, 702–03 (7th Cir. 2002). This makes the instant case different than *Coates*, which involved a private employer. By its plain language, however, the public accountability exception applies only when an employee of a public agency "otherwise meets the salary basis requirements of § 541.602…" Meaning: an employer like the State must "guarantee" the full salary in the first instance before it can use the public accountability exception as a basis for making deductions. Not incidentally, § 541.710 further establishes that the deductions must be based on the employees' failure to work when required to do so, as opposed to situations where the State decides it does not need their services for the full 80 hours. *See id.*, § 541.710(a) (public accountability exception applies only to "absences for personal reasons or because of illness or injury").

Defendants correctly note that § 541.710(b) permits public employers to make deductions "for absences due to a budget-required furlough" without the employee losing the salary basis status "except in the workweek in which the furlough occurs and for which the employee's pay is

---

[6] As it did with the question of whether Plaintiffs ever received a document describing their pay as "salary," the Court carefully reviewed the appendices in search of a "guarantee" that Plaintiffs would be paid for 80 hours of work every two weeks. It found nothing definitive. The ambiguity is perhaps best illustrated by the testimony of State employee Steven Ainger, who works in human resources. (Defs. Appx. 85–86.) Aigner admitted the collective bargaining agreements contain no such guarantee but suggested one might be found in the Position Description Questionnaire ("PDQ") for the RN position. (Id. at 85.) His testimony, however, was far from certain: "That's -- I think you could refer to [the PDQ] potentially as a guarantee. We don't -- we don't describe that on the PDQ as a guarantee. However, you know in -- you could probably look at that as a de facto guarantee under those regulations." (Id. at 86.)

accordingly reduced." The purpose of this provision "is to give public employers greater flexibility in times of financial difficulty without the risk of unexpectedly needing to pay additional retroactive overtime." *Bozzo v. City of Gilroy*, 982 F. Supp. 2d 1057, 1064 (N.D. Cal. 2013). Section 541.710(b) therefore undercuts Plaintiffs' reliance on the possibility of budget-related furloughs as a basis for arguing they are not salary-basis employees. Section 541.710(b) does not, however, speak to the underlying question of whether Plaintiffs were "guaranteed" the full 80 hours of pay in the first place. A public employer that declines to guarantee a qualifying level of pay to its employees cannot thereafter use the exception for budget-related furloughs as a reason to treat them as salary-basis for purposes of the FLSA. *See* 29 C.F.R. § 541.710(a) (employee must "otherwise meet[] the salary basis requirements of § 541.602" before the public accountability exception applies).

On the underlying question, the difference between Defendants' phrasing ("Plaintiffs are always scheduled to work at least 40 hours in a week…") and the phrasing of the governing regulation (requiring "a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked") goes to the heart of the FLSA's overtime requirements. An employer cannot characterize employees as "salaried" if it leaves itself the flexibility to schedule and pay them for less than 80 hours of work when the employer so desires. *See Coates*, 961 F.3d at 1048 ("[I]t is legally significant whether [the employees'] weekly salary was a matter of right or a matter of grace.") (quoting *Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183, 191 (6th Cir. 2017)). As the summary judgment record is "underdeveloped" on whether Plaintiffs are "guaranteed" to be paid for 80 hours each pay period, the Court cannot grant summary judgment for either side. *See id.* ("The overriding issue is whether exempt employees are 'paid according to a pay plan under which they are, *in fact*, guaranteed to receive no less than 1/26th of their annual salary each biweekly pay period, except for deductions otherwise expressly permitted.'") (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on FLSA (July 9, 2003), 2003 WL 23374601, at *2) (emphasis in original)).

## IV.    CONCLUSION

The Court concludes as a matter of law that Defendants have satisfied the "primary duties" test for the learned professional exemption under the FLSA. It therefore **GRANTS IN PART** Defendants' Motion for Summary Judgment (ECF 90). Neither side, however, has established as a matter of law that they prevail on the "salary basis" requirement. The Court therefore **DENIES**

**IN PART** Defendants' Motion for Summary Judgment and **DENIES** Plaintiffs' Partial Motion for Summary Judgment (ECF 89).

**IT IS SO ORDERED.**

Dated: August 30, 2022

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE